# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SARAVANAN RAMALINGAM, M.D., | No. 4:17-CV-00216 |
| Plaintiff. | (Judge Brann) |
| v. | |
| ROBERT PACKER HOSPITAL, et al., | |
| Defendants. | |

## ORDER

### DECEMBER 4, 2017

1. On February 5, 2017, Plaintiff Saravanan Ramalingam, M.D., filed a Complaint against Defendants, ECF No. 1, alleging the following facts:

   a. Dr. Ramalingam graduated from Stanley Medical College in India in 1998. In 2005, he completed a general surgery residency at that institution, and in 2006, he was certified in general surgery by the National Board of Examiners in New Dehli, India. ECF No. 1 ¶ 8.

   b. After further training, Dr. Ramalingam decided he wanted to become a board-certified general surgeon in the United States. To accomplish that goal, however, he needed to complete a general surgery residency at an accredited institution in this country. *Id.* ¶ 11.

c. Graduate medical education programs, including general surgery residencies, are governed in the United States by the American Board of Surgery ("ABS") and the Accreditation Council for Graduate Medical Education ("ACGME"). *Id.*

d. General surgery residencies in the United States normally last five years, but due to his prior experience and training, the ABS gave Dr. Ramalingam permission to enter a general surgery residency program as a 4th year resident – *i.e.*, as a "Post Grad Year Four" ("PGY-4") resident. *Id.* ¶ 12.

e. Defendant Robert Packer Hospital/Guthrie Healthcare System Auxiliary ("GHS") offered Dr. Ramalingam a spot in its General Surgery Residency Program ("Residency Program"), starting in October 2013. Because of his PGY-4 status, he was scheduled to graduate in September 2015. *Id.* ¶ 13.

f. Defendant Thomas VanderMeer, M.D., was the Director of GHS's Residency Program. Defendant Burt Cagir, M.D., was the program's Assistant Director. ¶¶ 4, 5.

g. The relationship between GHS and Dr. Ramalingam was governed by GHS's "House Officer Agreement," which obligated GHS to assign Dr. Ramalingam to the rotations required by ABS. *Id.* ¶ 14.

h. From October 2013 through January 2014, Dr. Ramalingam performed well in GHS's Residency Program. *Id.* ¶ 15.

i. ACGME normally requires general surgery residency program participants to perform at least 750 procedures during their residency, but because he would be in GHS's Residency Program for only two years, Dr. Ramalingam asked GHS and Dr. VanderMeer to contact ABS and ACGME to obtain a waiver for the 750-procedure requirement. Dr. VanderMeer and Laura Warner (GHS's residency coordinator) confirmed that they would "promptly" secure those waivers. Subsequently, Dr. VanderMeer and others at GHS advised Dr. Ramalingam that he had no minimum surgery volume requirements. *Id.* ¶ 16.

j. In February 2014, Dr. VanderMeer told ABS that Dr. Ramalingam was on track to complete the GHS Residency Program, and requested that Dr. Ramalingam's completion date be accelerated to June 2015. ABS granted this request on February 24, 2014. *Id.* ¶ 17.

k. Dr. Ramalingam successfully completed his PGY-4 requirements and was approved to advance to the PGY-5 class. Correspondingly, GHS and Dr. Ramalingam entered another "House Officer Agreement." *Id.* ¶ 18.

l.  Based on his newly-established June 2015 graduation date, Dr. Ramalingam began looking for a hepato-pancreato-biliary ("HPB") fellowship, to begin after completing GHS's Residency Program. *Id.* ¶ 20.

m.  Dr. VanderMeer wrote a recommendation letter for Dr. Ramalingam during this process. *Id.* ¶ 21.

n.  In June 2014, Dr. Ramalingam was accepted into a HPB fellowship at Dalhousie University in Nova Scotia, Canada. The fellowship was scheduled to begin in July 2015. *Id.* ¶ 22.

o.  While in GHS's Residency Program, Dr. Ramalingam worked closely with GHS's trauma surgeons. His "positive working relationship" with those surgeons, however, "adversely impacted his relationships" with Dr. VanderMeer and Dr. Cagir. *Id.* ¶¶ 5, 25, 28.

p.  On January 15 and February 5, 2015, Dr. Ramalingam participated in two peer review conferences, where he presented on two cases involving one of Dr. VanderMeer's patients. Dr. VanderMeer wanted Dr. Ramalingam to present the cases "in a manner critical" of a "certain general surgeon with whom [Dr.] VanderMeer had a conflict." Dr. Ramalingam, however, presented the cases "in the objective and factual manner in which he had been trained." In

response, Dr. VanderMeer "openly characterized" Dr. Ramalingam as "intellectually dishonest" and stated that Dr. Ramalingam "had engaged in a serious 'breach of medical professionalism.'" *Id.* ¶¶ 31, 32.

q. Although Dr. VanderMeer and Ms. Warner told Dr. Ramalingam that they would secure a waiver of ACGME's 750-procedure requirement, see *supra*, they in fact never contacted ACGME about that issue. *Id.* ¶¶ 19, 23.

r. On February 6, 2015, Dr. VanderMeer told Dr. Ramalingam that he would not complete GHS's Residency Program by June 2015 because he had not completed the 750-procedure requirement. *Id.* ¶ 34.

s. Sometime after March 2, 2015, Dr. Ramalingam learned that GHS's Residency Promotion Committee ("Committee") – over which Dr. VanderMeer and Dr. Cagir "exercised great influence" – decided that Dr. Ramalingam would not graduate in June 2015, noting that Dr. Ramalingam did not complete the 750-procedure requirement and did not complete rotations in pediatric surgery, endoscopy, thoracic surgery, and plastic surgery. The Committee reached this conclusion "based, at least in part, on false representations" by Dr. VanderMeer and Dr. Cagir. *Id.* ¶ 35, 36, 38.

t.  Dr. VanderMeer and Dr. Cagir were responsible for assigning Dr. Ramalingam to surgical rotations. Dr. Ramalingam did not complete the Committee-identified rotations because they had not been assigned to him. *Id.* ¶ 38-39.

u.  As a result of the Committee's decision, Dr. Ramalingam contacted Dr. Michele Molinari, the fellowship director at Dalhousie University, and arranged a later start date for his HPB fellowship. *Id.* ¶ 37, 46.

v.  Subsequently, however, Dr. VanderMeer called Dr. Molinari to advise him – falsely – that Dr. Ramalingam would not complete GHS's Residency Program "as. . . previously advised." Dr. VanderMeer also made "numerous" comments to Dr. Molinari "solely out of personal animus against [Dr.] Ramalingam." As a result, Dr. Molinari withdrew Dr. Ramalingam's fellowship offer. *Id.* ¶ 48.

w.  In May 2015, in response to direct correspondence by Dr. Ramalingam, ACGME indicated that Dr. Ramalingam did not need to complete the 750-procedure requirement in order to complete his Residency Program. This announcement, however, came after Dr. Molinari withdrew the fellowship offer. *Id.* ¶ 53.

x.  Dr. Ramalingam graduated from GHS's Residency Program in September 2015. *Id.* ¶ 54.

2. Dr. Ramalingam's Complaint contains four counts.

   a. In Count I, he alleges that Defendants breached their contract with him by, *inter alia*, not assigning him to the necessary rotations and not seeking a waiver of the 750-procedure requirement from the ACGME.

   b. In Count II, a promissory estoppel claim, he alleges that Defendants made "multiple representations, promises, and assurances" to him, which he reasonably relied on to his detriment.

   c. In Count III, he alleges that Defendants' actions amounted to tortious interference with his contractual relationship with Dalhousie University – *i.e.*, with his HPB fellowship there.

   d. In Count IV, he alleges that Defendants' actions amounted to tortious interference with prospective business relations – *i.e.*, with job offers he could have sought had he successfully completed the HPB fellowship at Dalhousie University.

3. On April 10, 2017, Defendants moved to dismiss portions of Dr. Ramalingam's Complaint, ECF No. 15.

   a. Defendants moved to dismiss Count II because "any contact Defendants had with Dr. Molinari[ and] Dalhousie University regarding Dr. Ramalingam was made with justification." Specifically, Defendants argue that Dr. VanderMeer's comments to Dr. Molinari

about Dr. Ramalingam were "truthful" or were "honest advice" and could not, therefore, constitute tortious interference with a contractual relationship under Pennsylvania law.

b. Defendants also moved to dismiss Count III because Dr. Ramalingam "has not sufficiently pled the existence of a prospective contract that is something more than mere hope," as is required under Pennsylvania law for a claim of tortious interference with prospective business relations.

c. Finally, Defendants moved to "dismiss all language indicative of punitive damages," because such damages are "applicable to only the most limited circumstances."

4. When considering a motion to dismiss for failure to state a claim upon which relief may be granted,[1] a court assumes the truth of all factual allegations in a plaintiff's complaint and draws all inferences in favor of that party;[2] the court does not, however, assume the truth of any of the complaint's legal conclusions.[3] If a complaint's factual allegations, so treated, state a claim that is plausible – *i.e.*, if they allow the court to infer

---

[1] Federal Rule of Civil Procedure 12(b)(6).

[2] *Phillips v. Cnty. Of Allegheny*, 616 F.3d 224, 228 (3rd Cir. 2008).

[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3rd Cir. 2016).

the defendant's liability – the motion is denied; if they fail to do so, the motion is granted.[4]

5. Dr. Ramalingam has adequately pled his claim for tortious interference with a contractual relationship. Dr. Ramalingam alleges that Dr. VanderMeer made false comments to Dr. Molinari, "solely out of personal animus." Although Defendants argue that these comments were in fact truthful (or were honest advice), this Court must assume the truth of Dr. Ramalingam's allegations at this stage of the proceedings.

6. Dr. Ramalingam has also adequately pled his claim for tortious interference with prospective business relations. Dr. Ramalingam alleges that, had he completed the HPB fellowship at Dalhousie University, he would have been eligible for job offers in the HPB field. Defendants argue that these job offers are nothing more than "mere hope." At this stage, based on the competitive nature of hiring in the medical field, this Court can infer that Dr. Ramalingam would have received at least one such offer.

7. Dr. Ramalingam has also adequately pled his claim for punitive damages. Among other things, and as noted *supra*, Dr. Ramalingam alleges that Dr. VanderMeer made "numerous" false comments to Dr. Molinari "solely out of personal animus."

---

[4] *Id.*

Therefore, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss, ECF No. 15, is **DENIED**.

2. Pursuant to Federal Rule of Civil Procedure 12(a)(4)(A), Defendants shall file an answer to Plaintiff's Complaint, ECF No. 1, within 14 days of the date of this Order.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge