# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SARAVANAN RAMALINGAM, M.D., | No. 4:17-CV-00216 |
| Plaintiff. | (Judge Brann) |
| v. | |
| ROBERT PACKER HOSPITAL, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

### AUGUST 21, 2019

Defendants Robert Packer Hospital/Guthrie Healthcare System Auxiliary, Robert Packer Hospital, Dr. Thomas VanderMeer and Dr. Burt Cagir have moved for summary judgment against Plaintiff Dr. Saravanan Ramalingam. For the following reasons, that motion is granted in part and denied in part.

## I.    BACKGROUND[1]

Dr. Ramalingam graduated from Stanley Medical College in India and eventually became certified in general surgery by India's National Board of Examiners. He later emigrated to the United States and sought to become board-certified under American standards. To become board-certified in the United States, Dr. Ramalingam needed to complete a general surgery residency.

---

[1] Unless otherwise noted, the facts are derived from the parties' statements of material facts, ECF No. 44-1 & 50.

Robert Packer Hospital ("RPH") in Sayre, Pennsylvania, offered Dr. Ramalingam a place in its general surgery residency program. Such residency programs are subject to requirements promulgated by the American Board of Surgery ("ABS") and the Accreditation Council for Graduate Medical Education ("ACGME"). Due to his extensive prior experience and training, the ABS gave Dr. Ramalingam permission to enter RPH's five-year residency program as a fourth year resident – *i.e.*, as a "Post Grad Year Four" ("PGY-4") resident. Because of his PGY-4 status, Dr. Ramalingam was scheduled to graduate in October of 2015.

Dr. Ramalingam commenced his general surgery residency in October 2013. In early 2014, Defendant Thomas VanderMeer, M.D., the Director of RPH's Residency Program, advised Dr. Ramalingam to apply for a post-residency fellowship. Such a fellowship, however, would have to commence in July 2015 – three months before Dr. Ramalingam was scheduled to graduate from the general surgery residency program. In early 2014, Dr. VanderMeer contacted the ABS and requested that Dr. Ramalingam be allowed to graduate in June 2015 rather than October 2015. The ABS agreed so long as Dr. Ramalingam achieved a requisite score on a qualifying examination and demonstrated the necessary clinical skills for a PGY-4 as attested to by Dr. VanderMeer.[2] Dr. Ramalingam exceeded the minimum score required and Dr. VanderMeer authored a letter attesting to Dr.

---

[2] Exhibit H - Letter from Dr. Frank Lewis 2/26/14 (ECF No. 52-4).

Ramalingam's clinical skills. The ABS then approved the June 2015 graduation date.

Dr. Ramalingam's early graduation should have been approved by the ACGME. ACGME requires surgical residents to complete 750 procedures over the length of their residencies, which typically last five years. Because Dr. Ramalingam entered RPH's program as a PGY-4, he would have to squeeze requirements designed to be completed over a five-year period into two years. Consequently, Dr. Ramalingam asked Dr. VanderMeer to contact ACGME to obtain a waiver for the 750-procedure requirement. Dr. VanderMeer and RPH's residency coordinator assured Dr. Ramalingam that they would. However, Defendants did not contact ACGME at the time they contacted ABS; they waited until February 2015 to do so.

Meanwhile, believing that he would be able to graduate in June 2015, Dr. Ramalingam applied to various hepatobiliary and pancreatic ("HBP") surgery fellowship programs. He was ultimately accepted into such a program at Dalhousie University in Nova Scotia, Canada. That fellowship would have started in July 2015, given that Dr. Ramalingam was set to graduate in June 2015.

But Dr. Ramalingam did not graduate in June 2015, and parties sharply differ as to why.

According to Defendants, Dr. Ramalingam began to exhibit deficiencies in his competence and professionalism. RPH faculty noted gaps his medical

knowledge,[3] clinical experience,[4] operative skills,[5] and ability to orally communicate and give presentations.[6] Dr. VanderMeer and Burt Cagir, M.D., Assistant Director of the RPH General Surgery Residency Program, wrote in their biannual resident review that they harbored "significant concerns about [Dr. Ramalingam's] ability to learn from his practice and to seek out high quality medical literature in order to improve his practice."[7] Dr. Cagir specifically described Dr. Ramalingam as lacking "intellectual honesty" because Dr. Ramalingam could not accept his own mistakes.[8]

But according to Dr. Ramalingam, his performance remained exemplary as other physicians rated him highly on periodic evaluations of his work[9] and assessment of his communication skills.[10] Dr. Ramalingam contends that Dr. VanderMeer and Dr. Cagir's efforts to undercut Dr. Ramalingam's professional competency arose from either personal animus or Dr. Ramalingam's perceived misalignment in internal hospital politics. For example, Dr. Ramalingam participated in two peer review conferences, where he presented on two cases

---

[3] Exhibit W - Biannual Resident Review (ECF No. 45-1) at 295.

[4] Exhibit P - Review by Dr. Fanelli (ECF No. 45-1) at 267.

[5] Exhibit U - Review by Dr. Fanelli (ECF No. 45-1) at 287; Exhibit V – Review by Dr. Larson Review (ECF No. 45-1) at 291.

[6] Exhibit S – Review by Dr. Casos Review (ECF No. 45-1) at 279.

[7] Exhibit W - Biannual Resident Review (ECF No. 45-1) at 295.

[8] Exhibit X - Review by Dr. Cagir (ECF No. 45-1) at 297.

[9] Exhibit – Review by Dr. Casos (ECF No. 45-1) at 279.

[10] Exhibit K – Short Deposition (ECF No. 52-11) at 6-7.

involving one of Dr. VanderMeer's patients. According to Dr. Ramalingam, Dr. VanderMeer wanted Dr. Ramalingam to present the cases in a manner critical of a certain general surgeon with whom Dr. VanderMeer had a conflict.[11] Dr. Ramalingam, however, explains that he reported the cases objectively and substantiated his explanations with medical literature—a course of action that Dr. Ramalingam says earned him Dr. VanderMeer's reproach when Dr. VanderMeer called Dr. Ramalingam "intellectually dishonest."[12]

In March 2015, RPH's Resident Promotion Committee ("RPC"), a faculty committee of surgeons who evaluate resident performance, convened and decided that Dr. Ramalingam was not prepared to graduate in 2015.[13] The committee noted that Dr. Ramalingam did not complete ACGME's 750-procedure requirement and did not complete rotations in pediatric surgery, endoscopy, thoracic surgery, and plastic surgery.

Dr. VanderMeer communicated the RPC's decision to Dr. Ramalingam,[14] identified the areas of Dr. Ramalingam's practice that concerned the committee, and provided Dr. Ramalingam with a draft remediation plan to improve his perceived deficiencies. As a result of the RPC's decision, Dr. Ramalingam

---

[11]  Exhibit G – Ramalingam Declaration (ECF No. 52-7) at 9.

[12]  *Id.* at 9-10.

[13]  Exhibit AA – RPC Meeting Minutes (ECF No. 45-1) at 309.

[14]  Dr. Ramalingam avers that in February 2015, Dr. VanderMeer told him that he would not graduate in June 2015 because he had not completed ACGME's 750-procedure requirement. Exhibit G – Ramalingam Declaration (ECF No. 52-7) at 6.

contacted Dr. Michele Molinari, the fellowship director at Dalhousie University, and arranged a later start date for his HPB fellowship.[15]

Dr. VanderMeer also decided to e-mail Dr. Molinari, explaining that Dr. Ramalingam would not graduate in time to start the fellowship in July 2015, at least in part because he did not achieve a minimum case volume. Dr. Molinari ultimately decided to revoke Dr. Ramalingam's fellowship offer, at least in part because Dr. Ramalingam would not graduate in June 2015.

Dr. Ramalingam appealed the RPC's decision by filing a grievance with the Impartial Fair Procedure Review Panel, and the panel upheld the RPC's decision not to graduate Dr. Ramalingam in June 2015.

At some point, Dr. Ramalingam began to correspond directly with ACGME. In May 2015, ACGME told Dr. Ramalingam that he need not complete the 750-procedure requirement to graduate. This announcement, however, came after Dr. Molinari withdrew the fellowship offer.

Dr. Ramalingam ultimately graduated from RPH's surgical residency program in September 2015 after completing Defendants' remediation program. He explains that because Defendants' wrongful actions deprived him of his HPB fellowship, he has been unable to secure the type of full-time employment he otherwise may have been able to obtain.

---

[15] Exhibit B – Ramalingam Deposition (ECF No. 52-2) at 35.

Dr. Ramalingam later filed a four-count complaint in this Court. In Count I, he alleges that Defendants breached their contract with him by, *inter alia*, not seeking a waiver of the 750-procedure requirement from ACGME. In Count II, a promissory estoppel claim, he alleges that Defendants made "multiple representations, promises, and assurances" to him, which he reasonably relied on to his detriment. In Count III, he alleges that Defendants' actions amounted to tortious interference with his contractual relationship with Dalhousie University – *i.e.*, with his HPB fellowship there. In Count IV, he alleges that Defendants' actions amounted to tortious interference with prospective business relations – *i.e.*, with job offers he could have sought had he successfully completed the HPB fellowship at Dalhousie University. Defendants moved to dismiss Count II, Count III, and Dr. Ramalingam's claim for punitive damages for failure to state a claim upon which relief may be granted.[16] This Court denied Defendants' motion to dismiss.[17]

Defendants presently move for summary judgment on all counts of Dr. Ramalingam's complaint.[18] Defendants argue that they are entitled to immunity

---

[16] Motion to Dismiss (ECF No. 15).

[17] Order (ECF No. 22).

[18] Motion for Summary Judgment (ECF No. 44).

under the Health Care Quality Improvement Act (HCQIA), or alternatively, that Dr. Ramalingam has failed to substantiate each of his causes of action.[19]

## II. DISCUSSION

### A. Standard of Review

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[20] A dispute is "genuine if a reasonable trier-of-fact could find in favor of the non-movant," and "material if it could affect the outcome of the case."[21] To defeat a motion for summary judgment, then, the nonmoving party must point to evidence in the record that would allow a jury to rule in that party's favor.[22] When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[23]

### B. Health Care Quality Improvement Act

Defendants argue that they are entitled to immunity under the HCQIA for all of Dr. Ramalingam's state law claims.[24]

---

[19] Brief in Support (ECF No. 45).

[20] Federal Rule of Civil Procedure 56(a).

[21] *Lichtenstein v. Univ. of Pittsburgh Medical Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986)).

[22] Federal Rule of Civil Procedure 56(c)(1); *Liberty Lobby*, 477 U.S. at 249.

[23] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[24] Brief in Support (ECF No. 45) at 34.

Congress passed the HCQIA to immunize professional review bodies from state law claims for money damages in an effort "to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior."[25] Professional review bodies include health care entities and committees formed within such entities to review the performance of other physicians.[26]

For an individual or entity to enjoy HCQIA's immunity, the challenged decision must have been made as part of a "professional review action," defined as:

> [A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.[27]

However, if the challenged decision was primarily based on "any other matter that does not related to the competence or professional conduct of a physician," – *i.e.* if the peer review action was pretextual – it cannot be considered

---

[25] *Matthews v. Lancaster Gen. Hospital,* 87 F.3d 624, 632 (3d Cir. 1996) (citing 42 U.S.C. §§ 11101(5) & 11111(a))

[26] 42 U.S.C. § 11151(11).

[27] 42 U.S.C. § 11151(9); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 203-04 (3d Cir. 2005) (explaining what conduct professional review actions may address to address a physician's unprofessional conduct as well as matters raising concerns for patients or patient care). If the action constitutes a "professional review action" within the meaning of the statute, action must meet basic fairness standards set forth in 42 U.S.C. § 11112(a).

a "professional review action" and accordingly, the challenged decision lies outside of the HCQIA's immunizing umbrella.[28]

Here, although courts may decide whether HCQIA immunity applies as a matter of law once the record becomes sufficiently developed,[29] determining whether Defendants' decision not to graduate Dr. Ramalingam early qualifies as a professional review action must be decided by the jury. On the one hand, a jury could credit evidence favorable to Defendants and conclude that the RPC was convened and decided to hold Dr. Ramalingam back because of his professional incompetence—that is, clinical concerns related to Dr. Ramalingam treatment of patients.[30] Record evidence suggests that the committee was concerned with Dr. Ramalingam's alleged "inability to demonstrate learning from poor outcomes,"[31] which, according to Dr. VanderMeer, manifested in one particular instance when Dr. Ramalingam failed to diagnose an obvious case of necrotizing fasciitis and failed to recognize his own mistake in the diagnosis' delay.[32] In sum, if a jury concludes that Defendants held Dr. Ramalingam back because of his competence

---

[28] 42 U.S.C. § 1l151(9)(E); *cf. Rogers v. Columbia/HCA of Cent. Louisiana, Inc.*, 971 F.Supp. 229, 234 (W.D. La. 1997) ("Having carefully reviewed the record in this case, we do not find that the peer review action taken against [the plaintiff physician] was pretextual. To the contrary, we find that the primary reason for the action against [him] was his professional incompetence.").

[29] *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d 1318 (11th Cir. 1994).

[30] Reply Brief (ECF No. 55) at 12-13.

[31] Exhibit AA – RPC Meeting Minutes (ECF No. 45-1) at 309.

[32] Exhibit G – VanderMeer Deposition (ECF No. 45-1) at 201.

or professional conduct, the HCQIA's immunity might apply, assuming other statutory requirements are met.[33]

On the other hand, a jury could credit evidence favorable to Dr. Ramalingam and find that the RPC was convened and ultimately decided to hold Dr. Ramalingam back primarily to protect the general surgery program and Dr. VanderMeer's position as program director.[34] Record evidence suggests that although Dr. VanderMeer admitted he could graduate Dr. Ramalingam without satisfying ACGM's 750 caseload requirement, Dr. VanderMeer feared that such an action would lead ACGME to "red flag" or sanction the program.[35] A jury could infer, then, that what motivated Dr. VanderMeer to hold Dr. Ramalingam back was to protect RPH's accreditation with ACGME, rather than to address Dr.

---

[33] Even if Defendants' action constituted professional review activity, for immunity to apply the professional action must still meet the basic fairness standards in 42 U.S.C. § 11112(a). "[A] professional review action must be taken-"(1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)." 42 U.S.C. § 11112(a).

[34] Brief in Opposition (ECF No. 49) at 18.

[35] Exhibit N – E-mail from Dr. Pigneri (ECF No. 52-14) at 2 (discussion regarding Dr. Ramalingam's graduation predicament); Exhibit MM – VanderMeer Notes from RPC Meeting (ECF No. 52-39) at 2 (Dr. VanderMeer's summary of the "Resident Promotion (Faculty) Meeting" that "graduating Dr. Ramalingam without meeting the requirement for operative case volume would result in a citation" for RPH's general surgery residency program); Exhibit AA – RPC Meeting Minutes (ECF No. 45-1) at 309 (notes from General Surgery Resident Promotion (Faculty) Meeting in which committee appears to express concern about possible citation).

Ramalingam's competence or professional conduct. If a jury so concludes, Defendants cannot seek shelter under the HCQIA.

Accordingly, because the jury must decide who to believe, the Court cannot at this time decide the applicability of the HCQIA, and summary judgment on this basis must be denied.

### C. Count I: Breach of Contract

Defendants argue that Dr. Ramalingam's breach of contract claim must fail because Dr. Ramalingam does not attach a contract to his complaint, does not set forth specific contractual terms, does not identify which of those terms were breached, and any damages flowing from the alleged breach were unforeseeable.[36]

To prevail on his breach of contract claim under Pennsylvania law, Dr. Ramalingam must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."[37]

Here, although Dr. Ramalingam spends time in his brief setting forth the law related to written contracts and claims that he has "stated the specific terms Defendants breached and the manner by which they breached," he points this Court to no written contract between the parties.[38] To the extent he intended to refer to

---

[36] Brief in Support (ECF No. 45) at 41-46; Reply Brief (ECF No. 55) at 17-18.
[37] *Hart v. Arnold*, 884 A.2d 316, 332 (Pa. Super. 2005).
[38] Brief in Opposition (ECF No. 49) at 56-62.

the House Agreement[39] executed between Dr. Ramalingam and RPH, Dr. Ramalingam does not explain how its terms were breached. Assuming, *arguendo*, that Defendants breached the House Agreement, Dr. Ramalingam does not discuss what damages were "reasonably foreseeable and within the contemplation of the parties" at the time they entered into the House Agreement.[40] Accordingly, summary judgment will be awarded to Defendants on Count I of Dr. Ramalingam's complaint.

To the extent Dr. Ramalingam argues that Defendants breached an enforceable contract because of their "failure to timely secure the necessary waivers, [and Dr.] Ramalingam did not graduate at the time promised, and lost his fellowship as a result, causing damages,"[41] it appears that Dr. Ramalingam conflates his breach of contract claim with his promissory estoppel claim. As is further discussed below, Dr. Ramalingam's promissory estoppel claim will survive.

### D. Count II: Promissory Estoppel

Defendants attempt to argue that any promises made to Dr. Ramalingam were fulfilled, and accordingly, Dr. Ramalingam's promissory estoppel claim must

---

[39] Exhibit I – House Agreement (ECF No. 45-1) at 237-251.

[40] *Ferrer v. Trustees of the University of Pennsylvania*, 825 A.2d 591, 610 (Pa. 2002).

[41] Brief in Opposition (ECF No. 49) at 60.

fail.[42]

To prevail on his claim for promissory estoppel claim under Pennsylvania law, Dr. Ramalingam must establish "(1) the promisor made a promise that he should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise."[43]

Here, a jury could conclude that Defendants promised Dr. Ramalingam that they would contact ABS and ACGME to obtain a waiver for the 750 procedure requirement so that Dr. Ramalingam could graduate in July 2015,[44] that Defendants not only failed to timely contact ACGME, but they asked Dr. Ramalingam not to contact ABS and ACGME himself,[45] that Dr. Ramalingam relied on Defendants' representation and did not contact ACGME until his graduation date became imperiled,[46] that Defendants' decision not to graduate Dr. Ramalingam was primarily based on refusal to grant a waiver,[47] and that because

---

[42] Brief in Support (ECF No. 45) at 46.

[43] *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000).

[44] Exhibit G – Ramalingam Declaration (ECF No. 52-7) at 5.

[45] Exhibit B – Ramalingam Deposition (ECF No. 52-2) at 24.

[46] Exhibit G – Ramalingam Declaration (ECF No. 52-7) at 6.

[47] Exhibit N (ECF No. 52-14) at 2; Exhibit MM (ECF No. 52-39) at 2; Exhibit AA (ECF No. 45-1) at 309. To the extent Defendants argue that Dr. Ramalingam's graduation was delayed because of concerns with his clinical abilities, *e.g.* Reply Brief (ECF No. 55) at 19-20, that issue is also for the jury to decide.

Defendants' did not graduate Dr. Ramalingam in light of the waiver issue, Dr. Ramalingam lost his fellowship at Dalhousie. A jury could conclude that Dr. Ramalingam suffered an injustice justifying an award of damages. Accordingly, Defendants are not entitled to summary judgment on the promissory estoppel claims set forth in Count II of Dr. Ramalingam's complaint.

### E. Count III: Tortious Interference with Contractual/Business Relations

Defendants further argue that Dr. VanderMeer did not contact Dr. Molinari intending to harm Dr. Ramalingam's contractual relationship with Dalhousie University.[48] Defendants also argue that Dr. VanderMeer's comments to Dr. Molinari about Dr. Ramalingam were "truthful" or were "honest advice" and could not, therefore, constitute tortious interference with a contractual relationship under Pennsylvania law.[49]

To prevail on his claim for tortious interference with a contract under Pennsylvania law, Dr. Ramalingam must establish, *inter alia*, that Defendants intended to harm an existing contractual relation and had no justification in doing so.[50] Defendants cannot be held liable under such a claim if Dr. VanderMeer gave

---

[48] Brief in Support (ECF No. 45) at 48-54.

[49] Reply Brief (ECF No. 55) at 20-23.

[50] *Remick v. Manfredy*, 238 F.3d 248, 263 (3d Cir. 2001).

Dr. Molinari "(a) truthful information, or (b) honest advice within the scope of a request for the advice."[51]

In the matter at hand, a jury could infer that Dr. VanderMeer unjustifiably intended to harm Dr. Ramalingam's contractual relationship with Dalhousie University by crediting evidence that Dr. Molinari revoked the extension that Dr. Ramalingam negotiated for himself after Dr. VanderMeer contacted Dr. Molinari to discuss Dr. Ramalingam's delayed graduation.[52] Even if Dr. VanderMeer were simply providing Dr. Molinari with truthful information or honest advice, his credibility – which remains a significant issue in this entire case – must be evaluated by a jury.[53] Accordingly, Defendants are not entitled to summary judgment on Count III of Dr. Ramalingam's complaint.

### F. Count IV: Tortious Interference with Prospective Business Relations

Defendants additionally argue that Dr. Ramalingam has failed to adduce evidence of any prospective business relations with which Defendants allegedly interfered.[54]

---

[51] *Walnut Street Assocs. v. Brokerage Concepts, Inc.*, 982. A.2d 94, 99 (Pa. Super. 2009).

[52] Exhibit B – Ramalingam Deposition (ECF No. 52-2) at 35.

[53] *See Walnut Street Assocs. v. Brokerage Concepts, Inc.*, 982. A.2d 94, 99 (Pa. Super. 2009) (citation omitted) ("one who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person (a) truthful information, or (b) honest advice within the scope of a request for the advice").

[54] Brief in Support (ECF No. 45) at 54-60.

To prevail on a claim of tortious interference with prospective business relations under Pennsylvania law, Dr. Ramalingam must establish, *inter alia*, the existence of a prospective contractual relation.[55] A prospective contractual relation is "something less than a contractual right, something more than a mere hope."[56]

Here, although Dr. Ramalingam argues that had he completed the HPB fellowship at Dalhousie University he would have been eligible for job offers in the HPB field, he adduces no evidence identifying prospective employers or prospective business relationships that were allegedly harmed by Defendants.[57] He also identifies no evidence that he would have been likely to secure a position in the HPB field.[58] At summary judgment, therefore, Dr. Ramalingam's claim for tortious interference with prospective business relations must fail, and Defendants are entitled to judgment in their favor on Count IV of the complaint.

---

[55] *Thompson Coal Co. v. Pike Coal Co.,* 412 A.2d 466, 471 (Pa. 1979)

[56] Id.

[57] *See Blackwell v. Eskin*, 916 A.2d 1123, 1128 (Pa. Super. 2007) (affirming trial court's grant of summary judgment to defendant when plaintiff provided no evidence that a prospective employer would have hired the plaintiff but for defendant's interference).

[58] *Accord Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.,* 401 F.3d 123, 140–41 (3d Cir. 2005) (determining that when contractor alleged it was deprived of an opportunity to bid on a project, the contractor did not establish a reasonable probability that he would have won the bid when there were other potential contractors that could have competed for and secured the bid).

### G. Punitive Damages

Finally, Defendants argue that Dr. Ramalingam has put forward insufficient evidence to warrant an award of punitive damages.[59] Pennsylvania law precludes the award of punitive damages as part of a promissory estoppel claim.[60] But if Dr. Ramalingam prevails on his claim for tortious interference with a contract, a jury could also infer that Dr. VanderMeer acted with sufficient culpability to warrant punitive damages.[61]

Accordingly, Defendants' motion to preclude the award of punitive damages as to Dr. Ramalingam's promissory estoppel claim is granted; but as to his tortious interference with a contract claim, the motion is denied.

## III. CONCLUSION

For the foregoing reasons, Defendants motion for summary judgment is granted in part and denied in part. An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[59] Brief in Support (ECF No. 45) at 60-61.

[60] *See Vigilante v. Statharos*, No. 08–CV–3408, 2009 WL 398781, at *3 (E.D.Pa. Feb. 16, 2009) (explaining that Pennsylvania law does not countenance the award of punitive damages in conjunction with a claim for promissory estoppel).

[61] *See Temporaries, Inc. v. Krane,* 472 A.2d 668 (Pa. Super. 1984) (explaining that punitive damages are available in claims for tortious interference with contractual relationships).