## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SARAVANAN RAMALINGAM, M.D. | No. 4:17-CV-00216 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| ROBERT PACKER HOSPITAL/GUTHRIE MEDICAL SYSTEM AUXILIARY, ROBERT PACKER HOSPITAL, THOMAS VANDERMEER, M.D., and BURT CAGIR, M.D. | |
| Defendants. | |

## MEMORANDUM OPINION

### OCTOBER 13, 2021

Before the Court are four motions *in limine* filed by the Defendants, Robert Packer Hospital/Guthrie Healthcare System Auxiliary, Robert Packer Hospital, Dr. Thomas VanderMeer, and Dr. Burt Cagir. The Hospital Defendants first three motions try to limit the damages that the plaintiff, Dr. Saravanan Ramalingam, may recover if he proves either of his claims that advanced past summary judgment, while the final motion once again seeks this case's outright dismissal under the Health Care Quality Improvement Act.

Before moving to the merits of these claims, a brief recap of this case's background and the applicable legal standard are in order.

## I.   BACKGROUND

This case stems from Ramalingam's time as a general surgery resident at Robert Packer Hospital. Before starting his Residency at the Hospital in October 2013, Ramalingam had graduated from Stanley Medical College in India and been certified in general surgery by India's National Board of Examiners. He then emigrated to the United States and sought to become board-certified under American standards. But to become board-certified in the United States, Ramalingam needed to complete a general surgery residency.

Robert Packer Hospital in Sayre, Pennsylvania, offered Ramalingam a place in its general surgery residency program. American residency programs are subject to requirements promulgated by the American Board of Surgery ("ABS") and the Accreditation Council for Graduate Medical Education ("ACGME"). Because of his extensive experience and training, the ABS allowed Ramalingam to enter the Hospital's five-year residency program as a fourth year resident—i.e., as a "Post Grad Year Four" ("PGY-4") resident. Because of his PGY-4 status, Ramalingam was scheduled to graduate in October 2015.

In early 2014, Defendant Thomas VanderMeer, M.D., the Director of Robert Packer's Residency Program, advised Ramalingam to apply for a post-residency fellowship. Such a fellowship, however, would have to commence in July 2015— three months before Ramalingam was scheduled to graduate from the general

surgery residency program. In early 2014, VanderMeer contacted the ABS and requested that Ramalingam be allowed to graduate in June 2015 rather than October 2015. The ABS agreed so long as Ramalingam achieved a requisite score on a qualifying examination and demonstrated the necessary clinical skills for a PGY-4 as attested to by VanderMeer.

But Ramalingam's early graduation also needed to be approved by ACGME. ACGME requires surgical residents to complete 750 procedures over the length of their residencies, which typically last five years. Because Ramalingam entered the residency program as a PGY-4, he would have to squeeze requirements designed to be completed over a five-year period into two years. So Ramalingam asked VanderMeer to contact ACGME to obtain a waiver for the 750-procedure requirement. VanderMeer and the Hospital's residency coordinator assured Ramalingam that they would. But Defendants did not contact ACGME when they contacted ABS; they waited until February 2015 to do so.

Meanwhile, believing that he would graduate in June 2015, Ramalingam applied to various hepatobiliary and pancreatic ("HBP") surgery fellowship programs. He was ultimately accepted into such a program at Dalhousie University in Nova Scotia, Canada. That fellowship would have started in July 2015, given that Ramalingam was set to graduate in June 2015.

But Ramalingam did not graduate in June 2015, and parties sharply differ as to why.

The short of it: the Hospital Defendants contend that Ramalingam's graduation was delayed because of legitimate gaps in his skills, knowledge, and experience. Ramalingam, however, alleges that his graduation was instead delayed because of personal animus and hospital politics.

Regardless of the cause, in March 2015, the Hospital's Resident Promotion Committee, a faculty committee of surgeons who evaluate resident performance, convened and decided that Ramalingam was not prepared to graduate in 2015. The committee noted that Ramalingam did not complete ACGME's 750-procedure requirement and did not complete rotations in pediatric surgery, endoscopy, thoracic surgery, and plastic surgery.

VanderMeer communicated the RPC's decision to Ramalingam, identified the areas of Ramalingam's practice that concerned the committee, and provided Ramalingam with a draft remediation plan to improve his perceived deficiencies. As a result of the RPC's decision, Ramalingam contacted Dr. Michele Molinari, the fellowship director at Dalhousie University, and arranged a later start date for his HPB fellowship.

VanderMeer also decided to email Molinari, explaining that Ramalingam would not graduate in time to start the fellowship in July 2015, at least in part

because he did not achieve a minimum case volume. Molinari ultimately decided to revoke Ramalingam's fellowship offer, at least in part because Ramalingam would not graduate in June 2015.

Ramalingam appealed the RPC's decision by filing a grievance with the Impartial Fair Procedure Review Panel, and the panel upheld the RPC's decision not to graduate Ramalingam in June 2015.

At some point, Ramalingam began to correspond directly with ACGME. In May 2015, ACGME told Ramalingam that he need not complete the 750-procedure requirement to graduate. This announcement, however, came after Molinari withdrew the fellowship offer.

Ramalingam ultimately graduated from the Hospital's surgical residency program in September 2015 after completing Defendants' remediation program. He explains that because Defendants' wrongful actions deprived him of his HPB fellowship, he has been unable to secure the type of full-time employment he otherwise may have been able to obtain.

Ramalingam later filed a four-count complaint in this Court. Since that complaint was filed, I have ruled on the Hospital Defendants' motion to dismiss and motion for summary judgment. I denied the motion to dismiss, but later awarded the motion for summary judgment in part—whittling Ramalingam's claims from four to two by dismissing his breach of contract and tortious interference with prospective

business relations theories. Still, I allowed his promissory estoppel and tortious interference with contractual relations to move forward to trial. And, in doing so, I rejected the Hospital Defendants arguments that they were protected against this suit by the Health Care Quality Improvement Act and that Ramalingam could not recover punitive damages should he succeed on his tortious interference claim.

Now, as trial approaches, I consider four motions *in limine* by the Hospital Defendants that tread much of the same ground.

## II.     LAW

The purpose of motions *in limine* are to aid the clear presentation of evidence at trial. "Evidence should only be excluded on a motion *in limine* if it is clearly inadmissible on all potential grounds. The movant bears the burden of demonstrating that the evidence is inadmissible on all potential grounds."[1]

## III.    ANALYSIS

### A.     The Defendant's Motion *In Limine* to Dismiss the Claims Under the HCQIA

Given its outcome-determinative nature, I'll begin with the Hospital Defendant's final motion *in limine* asking that this case be dismissed. Their rationale: Ramalingam has failed to produce expert testimony that would allow a jury to find that the Resident Promotion Committee's decision to delay his

---

[1]     *Hunt v. Drake*, 2020 WL 3402343, at *1 (M.D. Pa. June 19, 2020).

graduation was not protected by the Health Care Quality Improvement Act's (HCQUIA) immunity bar.

This claim largely retraces the ground covered at summary judgment—albeit with a slight twist. So a brief synopsis is fitting.

As I covered in my summary judgment motion: "Congress passed the HCQIA to immunize professional review bodies from state law claims for money damages in an effort 'to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior.'"[2] But to acquire this immunity the professional review body's "challenged decision must have been made as part of a 'professional review action[]' . . . ."[3] And to qualify as a "professional review action" under the statute, the decision must be "based on the competence or professional conduct of an individual physician."[4] In contrast, "an action is not considered to be based on the competence or professional conduct of a physician if the action is primarily based on . . . any other matter that does not relate to the competence or professional conduct of a physician."[5]

If a plaintiff shows that the action is not based on his competence or professional conduct, then there's no immunity. But if the plaintiff cannot show that

---

[2]   *Ramalingam v. Robert Packer Hosp.*, 2019 WL 3943015, at *4 (M.D. Pa. Aug. 21, 2019).
[3]   *Id.*
[4]   42 U.S.C. § 11151.
[5]   42 U.S.C. § 11151(9)(E).

the decision was not a competence- or professional conduct-driven professional review action, the inquiry is not over—the review body's action must still have been reasonable.[6]

To guide this inquiry, the statute provides four reasonability factors. That is, to attain immunity:

> a professional review action must be taken—
> (1) in the reasonable belief that the action was in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).[7]

Defendants' professional review actions are presumed to meet these requirements. And to overcome this presumption, plaintiffs must rebut them "by a preponderance of evidence."[8]

So Ramalingam's task at trial will be to show that the committee's decision to delay his graduation was not a professional review action or, barring that, that committee's decision didn't meet the four reasonability requirements—which brings us to the heart of this motion.

---

[6]    42 U.S.C. § 11112(a)
[7]    42 U.S.C. § 11112(a)
[8]    *Id.*

- 8 -

The Hospital Defendants argue that expert testimony is needed to show that the Committee's decision was not a protected "professional review action" or that the four fairness requirements have not been met.[9] And Ramalingam hasn't put forward an expert—so that should be it: case closed. The Hospital Defendants arrive at this conclusion because in their view, bias is immaterial under the Act: Ramalingam must show that the Committee's stated rationale—his purported technical shortcomings and misdiagnosis of a case—are not objectively reasonable grounds to delay a resident's graduation.[10]

In reply, Ramalingam claims that expert testimony is not required because his case centers not on whether he "provided adequate care in a particular case but whether the allegations represented to the RPC about [his] competency were even true."[11] So his argument is not that a committee shouldn't hold someone back if faced with the same list of competency concerns. Instead, he is arguing that here those concerns were false because they were based on "manipulated information and reviews."[12] Or, in the alternative, that these competency concerns weren't the primary reason his case came before the committee—with the real reason being to protect VanderMeer and the general surgery program from a ACGME "red flag."[13]

---

[9]    *See generally* Doc. 94.
[10]   *See id.* at 6.
[11]   Doc. 101 at 10.
[12]   *Id.* at 8.
[13]   *Ramalingam*, 2019 WL 3943015, at *4–5.

Therefore, if he can show that the Hospital Defendants were motivated by ill-will or a desire to shield the program from scrutiny, or that the Defendants manipulated his review committee or the materials that they considered, then a jury could find that the Committee's decision was based primarily on something besides his professional conduct or that the decision was unreasonable because it was tainted by falsified reports.

The parties' arguments largely retrace those made at summary judgment, and the distinction that the Hospital Defendants raise—that Ramalingam has not provided expert testimony—does not alter my initial finding. At summary judgment, I held that the application of HCQIA immunity would come down to a credibility determination. Attacking the medical basis for the committee's decision may be one way to show that a professional review action was based primarily on something besides the "competence or professional conduct of a physician"—but it is not the only way.[14] If Ramalingam can show that facts underlying the committee's medical basis were unsound because VanderMeer falsified reports, or that despite this objective basis there was a separate impermissible "primary reason" for the action, then the HCQIA does not apply. And on these points, the Hospital Defendants have given me no reason to believe that expert testimony is necessary for Ramalingam to meet his burden.

---

[14]   *Id.*; *see* 42 U.S.C. § 11151.

For that reason, the Hospital Defendants' final, dispositive motion *in limine* is denied.

### B.   The Defendant's Motion *In Limine* to Preclude Economic Loss Evidence

Aside from their immunity gambit, the Hospital Defendants also attack Ramalingam's potential recovery on three fronts. The first that I'll consider is their motion *in limine* asking that I prevent Ramalingam from presenting evidence of his economic loss.[15] They provide two rationales. First, they contend that Ramalingam's damages are too speculative to be put before a jury.[16] And second, they argue that, to make his claim, Ramalingam must produce expert testimony showing that he has been prevented from practicing as an HBP; and because he hasn't, his damages claim lacks a necessary predicate and can't be put before a jury.[17]

Beginning first with the Hospital Defendants' argument that Ramalingam's economic loss evidence is too speculative to allow forward. This claim centers on the discrepancy between how much Ramalingam earned in years past (often in excess of a $500,000) and his experts' use of his current salary ($425,000) in their damages calculation—and then juts out in two directions.[18]

---

[15]   *See generally* Doc. 92; Doc. 107.
[16]   *See* Doc. 92 at 11–13.
[17]   *Id.* at 14–15.
[18]   *See id.* at 11–13; Doc. 107 at 5–6.

To start, the Hospital Defendants question whether $425,000 is actually Ramalingam's salary—insinuating that it's not (despite Ramalingam having stated as much in interrogatories) and arguing that this renders the experts' report too vague to go before a jury.[19] They then move on to a related argument, claiming that because Ramalingam took home more than the experts assumed, missing out on the fellowship was in fact a financial boon, and thus their report is unreliable.[20]

As Ramalingam explains in his brief, this discrepancy stems from his transition from per diem work to salaried work. Between completing the residency program in September 2015 and accepting a salaried position at Garnett Hospital in February 2020, Ramalingam pieced together a sizeable income by working inconvenient hours (nights, weekends, and holidays) at inconvenient hospitals (including shifts in South Dakota) on a temporary basis. To ditch this transient lifestyle, Ramalingam took a pay cut to become a salaried general surgeon.[21] And his W-2 reflects that new salary.[22] (The Hospital Defendants take this explanation to mean that Ramalingam is now seeking lifestyle losses. That's not my read, as I'll explain in a moment.)[23] But because Ramalingam didn't begin the salaried position

---

[19]   Doc. 107 at 4–5.
[20]   *Id.*
[21]   Doc. 105 at 6–9.
[22]   *Id.* at 8–9.
[23]   *See* Doc. 107 at 6–8.

until February 2020, his 2020 tax documents reflect his continued contract work at the start of the year.[24]

The problem is that his 1099s for his contract work includes payments of $159,878.63 from Garnett Health (along with $364,341.40 from them reflecting his pro-rated $425,000 salary) and $186,110.00 from BronxCare Health System— which is far more than one might expect a doctor to take home from a little over a month of temporary work.[25] Ramalingam clarifies that those two contract payments include 2019 salary and that he earned $24,736 from BronxCare and $24,746 from Garnett in 2020 before taking his salaried position, and he further notes that he will testify to his current income. But the Hospital Defendants maintain that a conspiracy is afoot, arguing that "he is clearly earning more" and hasn't been forthcoming about his other sources of income.[26]

What the parties appear to be dancing around is the distinction between Ramalingam's income and his salary. Doctors aren't restricted to salaried positions; and that includes both salaried doctors who moonlight and increase their paycheck by picking up extra shifts and doctors who cobble together their income exclusively through contract gigs. Ramalingam's experts based their report on the difference between the salary that he could have earned with the fellowship and the salary that

---

[24]   Doc. 105 at 6–7.
[25]   Doc. 92 at 6.
[26]   Doc. 107 at 5.

he could have earned without it. But Ramalingam spent the better part of five years working on a contract basis—and, if the Hospital Defendants' insinuations are to be believed, he may still be doing so to supplement his salary.[27]

So does this salary-contract work distinction, as the Hospital Defendants suggest, render Ramalingam's evidence of economic loss "completely speculative" such that I should cut his case off at the knees? Probably not.

The jury will be provided evidence that by moonlighting or taking on per diem work Ramalingam brought home a sizeable income. What they choose to do with this evidence is a question of weight. And Ramalingam should be allowed to testify that this sizeable income came at a cost—not to recoup damages for this period as the Hospital Defendants suggest, but to show that his pay cut was in effect a promotion because he would no longer need to jet across the country to work holidays and weekends.

At bottom, the Hospital Defendants have not convinced me that Ramalingam should be prevented from even trying to show that, despite being well off, he would have been better off had he completed the fellowship. Focusing solely on salary may make his claim less compelling, but the fact that he took on enough contract work to exceed that salary doesn't mean that he has earned his way out of a recovery.

---

[27]   *Id.*

The Hospital Defendants' second argument suffers from the same deficiencies. They have failed to show that expert testimony establishing that Ramalingam cannot practice in the HBP subspecialty is required. And that absent this showing, this court cannot then conclude that Ramalingam's failure to introduce that testimony means that the jury cannot be presented with evidence of economic loss.

The Hospital Defendants rest their second expert testimony requirement claim on a citation to a case that generally highlights expert's testimony's importance. That Pennsylvania Superior Court case, *Dion v. Graduate Hospital of the University of Pennsylvania*,[28] notes that:

> Frequently, the jury, or the court trying a case without a jury, is confronted with issues which require scientific or specialized knowledge or experience in order to be properly understood. Certain questions cannot be determined intelligently merely from the deductions made and inferences drawn from practical experience and common sense. On such issues, the testimony of one possessing special knowledge or skill is required in order to arrive at an intelligent conclusion. . . .
>
> In a logical and fundamental sense, a verdict is worth only as much as the evidence upon which it is based. In a complex case, a jury, in order to reach an intelligent conclusion, is dependent on expert testimony. If the jury is enlightened, it will reach the right verdict. Unaided by the explanations and opinions of those with specialized knowledge or skill, the ultimate conclusion might just as well be based on evidence presented in a language unfamiliar to the jury. Unless the jury is comprised of experts in the field, the verdict is based on mere conjecture. Such a verdict is worthless.[29]

---

[28]   520 A.2d 876 (Pa. Super. 1987)
[29]   *Id.* at 881.

But the Hospital Defendants fail to tether this broad statement, which was penned in the context of a medical malpractice claim, to this case. Without explaining why, they merely state that the issue is "complex" and thus "without this expert testimony, the verdict would be based on mere conjecture."[30] Perhaps introducing expert testimony on this front would make Ramalingam's case more convincing. But far more is needed to convince this Court that a jury could not reasonably find, whether through Ramalingam's testimony or his economic experts' survey of the employment landscape, that it's hard to find HBP work—or, perhaps more to the point, hard to get paid like an HBP subspecialist—without a fellowship.

Accordingly, this motion *in limine* is denied.

## C.    The Defendant's Motion *In Limine* to Limit Damages Under the Two Remaining Claims

The Hospital Defendants also seek to limit (or, in reality, eliminate) Ramalingam's damages under his two theories that survived summary judgment. First, they argue that any recovery on his promissory estoppel claim should be limited to "the amounts lost and expended in reliance on the promise."[31] And in their view, that's only the "costs incurred seeking to obtain a fellowship beginning in July 2015" and the "costs incurred in finalizing his fellowship agreement with Dr.

---

[30]    Doc. 92 at 14.
[31]    Doc. 90 at 3.

Molanari in July 2015."[32] Second, they argue that his recovery for tortious interference with a contractual relationship should be limited to his "actual financial losses." And they define these financial losses as just the pay of his two-year fellowship contract, less what he earned—not future earnings.[33]

At the heart of the Hospital Defendants' first argument, that Ramalingam's promissory estoppel damages should be limited to July 2015, is a distinction between bona fide contracts and promises that are enforced without consideration because parties detrimentally relied on them. When a contract is breached, expectation damages are the norm.[34] But if the breach is instead of a promise that can only be enforced through promissory estoppel, expectation damages are not automatic.[35] Rather, because the remedy "may be limited as justice requires" the Pennsylvania Supreme Court has suggested that reliance damages should be the typical course.[36]

Yet this legal backdrop does not mean, as the Hospital Defendants suggest, that awarding a different sort of damages is to "take an expansive view of what damages are available under a cause of action for promissory estoppel."[37]

---

[32]   *Id.*
[33]   *Id.* at 9.
[34]   *See ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998).
[35]   *See Lobolito, Inc. v. N. Pocono Sch. Dist.*, 755 A.2d 1287, 1293 n.10 (Pa. 2000) (noting that a plaintiff's promissory estoppel recovery would be limited to the "amount of money it expended in reliance on the school board's promise."); *Banas v. Matthews Int'l Corp.*, 502 A.2d 637, 648 n.12 (Pa. 1985) ("Recovery on the theory of promissory estoppel, is ordinarily limited to recovery of amounts lost and expended in reliance on the promise . . . in order to place the plaintiff in the position he would have occupied had the promise never been made.").
[36]   *See id.*; Restatement (Second) of Contracts § 90 (1965).
[37]   Doc. 106 at 4.

Pennsylvania law is clear that while reliance damages are typical route, courts are well within their authority to take another avenue. The Pennsylvania Supreme Court has adopted Section 90 of the Restatement (Second) of Contracts, which provides that the remedy for promissory estoppel claims "may be limited as justice requires" while emphasizing in comment (d) that "full scale enforcement by normal remedies is often appropriate."[38] Given the panoply of options available, and the instruction to scale back as justice requires, a host of courts have permitted parties to recover expectation damages in promissory estoppel claims.[39] This is all to say that, contrary to what the Hospital Defendants argue, the "strict limits of Pennsylvania Law" do not inherently limit Ramalingam to reliance damages.[40]

The question instead is whether the interests of justice require that the remedy be so limited here.[41] Naturally, the Hospital Defendants say they do—and claim that Ramalingam has failed to show that equities between the parties require that I not take the often-traveled reliance route.[42] But a closer inspection of the equities at play show this claim's audacity.

---

[38] Restatement (Second) of Contracts § 90; *see Murphy v. Burke*, 311 A.2d 904, 908 (Pa. 1973) (noting that section 90 of the Second Restatement is the law of Pennsylvania).

[39] *See Achenbach v. Atl. Specialty Ins. Co.*, 2018 WL 5264304 (E.D. Pa. Oct. 22, 2018) (collecting cases).

[40] Doc. 106 at 5.

[41] Restatement (Second) of Contracts § 90.

[42] Doc. 106 at 5.

The Hospital Defendants ask that I limit Ramalingam's recovery to the costs of searching for and finalizing his fellowship agreement (effectively zero in theory and in practice, as these are minor costs that haven't been itemized anyway). And, mind you, that's if the jury found that the Hospital Defendants caused Ramalingam to miss out on the fellowship because his graduation date was delayed; and that the delay only arose because Ramalingam banked on the Hospital Defendants' promised waiver, which they not only failed to obtain but discouraged him taking care of himself.[43] This is no more than an attempt to immunize incompetence. I decline to do so.

Should the jury find that the Hospital Defendants' broken promise caused Ramalingam to lose out on the fellowship, justice in fact requires that he be able to try to prove his lost expectation damages because awarding reliance damages is not a recovery at all. And, as I addressed above, Ramalingam's loss of future income expert report is an appropriate way to do so. His experts' approach, which takes the difference between his current salary and what he could expect to have made the HBP fellowship credential, is not "merely conjecture" as the Hospital Defendants argue.[44] Nor is the fact that he raked in a greater salary by flitting across the country doing temp work disqualifying. The Hospital Defendants effort to limit

---

[43]   *Ramalingam*, 2019 WL 3943015, at *6.
[44]   Doc. 90 at 9.

Ramalingam's loss of future income damages on his promissory estoppel count are therefore denied.

The Hospital Defendants take a similar tack in asking that I upend Ramalingam's recovery should he prove his tortious interference with a contractual relationship claim. They argue first that, under this tort claim, Ramalingam can only recover for his "actual financial losses."[45] And they define his "actual financial losses" as what he would have earned during the two-year fellowship ($75,000 per year) less what he ended up taking home during those two years (around $100,000 in year one and $400,000 in year two)—so no recovery. In support of their argument for this limited time-horizon, they point to my decision to dismiss Ramalingam's claim for tortious interference with *prospective* business relations at summary judgment.[46] In essence, because I found that Ramalingam had failed to identify prospective employment relationships that were harmed then, he now cannot seek damages for his loss of prospective employment.[47]

So what sort of recovery is Ramalingam entitled to if he can show that VanderMeer contacted Molinari with the intent to sink Ramalingam's fellowship, and in doing so provided Molinari with information that was neither true nor honest, requested advice? Nothing, as the Hospital Defendants argue?

---

[45] *Id.*

[46] *Ramalingam*, 2019 WL 3943015, at *6.

[47] Doc. 90 at 10.

As Ramalingam highlights, the Pennsylvania Supreme Court has adopted the Second Restatement approach to tortious inference damages. And the applicable Restatement provision, section 774A, permits plaintiffs to recover for "the pecuniary loss of benefits of the contract" as well consequential losses, emotional distress, and loss of reputation.[48] The Hospital Defendants take Ramalingam's explanation of the law as a last ditch effort to recover damages for emotional distress and reputational harms. I think this read misses the mark.

Rather, I read Ramalingam's explanation as highlighting the deficiencies in the Hospital Defendants' initial brief—particularly its incomplete explanation of the damages avaialbe under the claim and an attendant error in logical reasoning. To open their brief on this claim, the Hospital Defendants wrote:

> With regard to damages under a Tortious Interference with Contractual/Business Relations cause of action, a plaintiff in a tortious interference claim must allege actual pecuniary loss arising from the inference. *Shiner v. Moriarty*, 706 A.2d 1228, 1238 (Pa. Super. 1998). Therefore, Ramalingam's losses under this cause of action are limited to his "actual financial losses" which would be the $75,000 (plus additional $75,000 for the second year), he was set to earn for his fellowship at Dalhousie University (*See* Exhibit "C": Letter from Dr. Molinari dated 1/12/15).[49]

For one, as Ramalingam shows through his explanation of the pertinent Restatement provision and a series of Pennsylvania cases applying it, this opening salvo fails to

---

48   Restatement (Second) of Torts § 774A.
49   Doc. 90 at 9.

describe the full scope of a plaintiff's potential recovery under this cause of action.[50] Plaintiffs can recover for a host of harms besides their pecuniary loss. And second, despite the "therefore" tossed in, it doesn't follow that because plaintiffs "must allege actual pecuniary loss arising from the interference[,]" Ramalingam must then be "limited to his 'actual financial losses.'"[51] Ramalingam is correcting the record, noting that if he had other harms, he wouldn't be as limited as the Hospital Defendants suggest—not adding damages claims beyond his actual pecuniary losses.

Setting aside this squabble (but with the legal landscape still in mind), let's move to the heart of the Hospital Defendants' claim—that Ramalingam is limited to the "actual financial losses" of the contract, which was worth just $75,000 (and would thus be offset by his earnings during those two years).[52] The Hospital Defendants' argument that his recovery window is capped at two years hinges on this court's decision to jettison Ramalingam's tortious interference with prospective business relations claim. In their view, this summary judgment decision, which held that Ramalingam's claim failed because he hadn't identified specific prospective employers or a likelihood of landing a job as a HBP subspecialist, dooms his damages claim.[53] The logic is intuitive: if Ramalingam couldn't identify a

---

[50]  *See* Doc. 103 at 9–10.
[51]  Doc. 90 at 9.
[52]  Doc. 103 at 9–11.
[53]  Doc. 90 at 10.

prospective contractual relationship, then how could his damages claim succeed when it rests on this same prospective employment?

In reply, Ramalingam argues that the Hospital Defendants' reliance on this court's reasoning in dismissing this separate claim is misplaced and that the applicable law entitles him to recover for his "lost pecuniary benefits flowing from the contract itself."[54] And that here, the lost benefits flowing from the contract include the income that he would have earned had be been able to practice as a PHB subspecialist.[55]

The Hospital Defendants' argument is creative—and has some intuitive appeal—but it falls short under closer scrutiny. That's because the certainty required of a prospective relationship is different from the certainty required to prove damages.

At summary judgment, I dismissed Ramalingam's prospective tortious interference claim because it was an inexact fit. Unlike his tortious interference claim, which centered on interference with his fellowship contract, Ramalingam's prospective tortious interference claim lacked a certain, underlying predicate. Apart from the obvious—finding a job within the subspeciality—he had no particular plan. That he didn't was perhaps dictated by circumstances. At that point, he hadn't even started the two-year fellowship; it's unlikely that there'd of been a posting he could

---

[54] *Id.* at 10 (quoting *Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. 1987)).
[55] *See id.*

even apply to. But because he had nothing in the works, Ramalingam could not identify a particular opportunity that the Hospital Defendants had tortiously interfered with—and it's impossible to show that you are likely to land an unidentified opportunity. So Ramalingam's circumstances dictated the result: he was not yet far enough along in the process to have a protected interest.

The same is not required for Ramalingam to prove his damages. Here, the question is not whether there was enough of a relationship to give rise to a protected interest. Instead, the question is whether Ramalingam has proven this loss "with reasonable certainty."[56] "In this Commonwealth . . . damages are to be compensated to the full extent of the injury suffered."[57] And concerns about the uncertainty of the amount should give way when there is certainty as to the cause:

> [R]ecovery will not be precluded simply because there is some uncertainty as to the precise amount of damages incurred. It is well established that mere uncertainty as to the amount of damages will not bar recovery where it is clear that damages were the certain result of the defendant's conduct.... The basis for this rule is that the breaching party should not be allowed to shift the loss to the injured party when damages, even if uncertain in amount, were certainly the responsibility of the party in breach.[58]

A "mere guess or speculation is not enough."[59] But even then, "[t]he law does not require that proof in support of claims for damages or in support of compensation

---

[56]   *Miller Oral Surgery, Inc. v. Dinello*, 416 Pa. Super. 310, 318 (Pa. Super. 1992).

[57]   *Kaczkowski v. Bolubasz*, 421 A.2d 1027, 1030 (Pa. 1980).

[58]   *Dinello*, 611 A.2d at 236–37 (quoting *Pugh v. Holmes*, 405 A.2d 897, 909–10 (Pa. 1979)).

[59]   *Kaczkowski*, 421 A.2d at 1027 (quoting *Lach v. Fleth*, 64 A.2d 82 (Pa. 1949)).

must conform to the standard of mathematical exactness."[60] Instead, all that's required is "support by a reasonable basis for calculation . . . ."[61]

As a result, it's not unheard of for claimants to recover lost income from jobs that had yet to come to fruition. To give just one example, a family recovered lost future earnings for the death of their college-aged son, though he had neither a job offer nor had he contacted potential employers.[62] The Hospital Defendants give me no reason to think that the certainty of the testimony that Ramalingam is prepared to offer doesn't clear that bar.

The insufficiency of Ramalingam's prospective tortious interference claim does not justify withholding this issue from the jury. I cannot say that if a jury found that the Hospital Defendants tortiously denied Ramalingam a valuable credential, that Ramalingam has provided inadequate grounds for the jury to then be reasonably certain that he has been harmed to the tune of $125,000 a year.

The Hospital Defendants motion *in limine* to limit Ramalingam's damages under the remaining causes of action is therefore denied.

---

[60]   *Lach*, 64 A.2d at 827.
[61]   *Stevenson*, 197 A.2d at 727.
[62]   *Kaczkowsk*, 421 A.2d at 1028–29.

### D.     The Defendants' Motion *In Limine* to Dismiss Punitive Damages

In their first motion *in limine*, and the final that I consider, the Hospital Defendants seek to dismiss Ramalingam's punitive damages claim, which is tied to his tortious interference with contractual relations cause of action.

I covered this ground at summary judgment. As I explained then, to prevail on his tortious interference claim, Ramalignam must show that VanderMeer "intended to harm an existing contractual relation and had no justification in doing so"[63] and, in doing so, gave Molinari information that was neither "truthful" nor "honest advice within the scope of the of the request for advice."[64] I also noted that If that underlying claim succeeded, then punitive damages would be appropriate provided that Ramalingam had also shown that VanderMeer's interference was outrageous and done with a bad motive or reckless indifference.[65]

Based on the record, I allowed Ramalingam to proceed with his tortious inference claim. In the process, I highlighted that it would be up to the jury to decide whether to credit VanderMeer's claim that he did not contact Molinari intending to harm Ramalingam's contractional relationship or that, regardless, what he said to Molanari was true or pertinent, honest advice.[66] And thus it followed that his claim

---

[63]   *Ramalingam*, 2019 WL 3943015, at *6.

[64]   *Id.* (quoting *Walnut St. Assocs. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 99 (Pa. Super. 2009)).

[65]   *Id.* at *7–8. See also Chambers v. Montgomery*, 192 A.2d 355, 358 (Pa. 1963).

[66]   *Id.* at *7.

for punitive damages could go forward as well because if "Dr. Ramalingam prevails on his claim for tortious interference with a contract, a jury could also infer that Dr. Vander Meer acted with sufficient culpability to warrant punitive damages."[67]

The Hospital Defendants put forward two grounds that they argue favor going back on this decision. First, they argue that Ramalingam has not shown that he has suffered damages as a result of his inability to complete the fellowship—and that without compensatory damages, a jury cannot impose punitive damages.[68] Second, they argue that VanderMeer's actions—specifically his conversations with Molanari—do not "rise to the level necessary for the imposition of punitive damages."[69]

Turning first to the Hospital Defendants' claim that there are no compensatory damages to tie a punitive award to. I disposed of the meat of this claim above, but to reiterate, a jury could find that Ramalingam suffered an actual loss—even though he cobbled together a sizable salary in the intervening years. And while it's by no means a given, should the jury agree with his damages claim, there would be compensatory damages to tie to his punitive damage claim. Therefore, this argument fails.

The Hospital Defendants dive into the record to support their second theory— that VanderMeer and Molanari's conversations show no ill will. But in doing so,

---

[67] *Id.*

[68] Doc. 88 at 5–8.

[69] *Id.* at 10. *See generally id.* at 9–17.

they largely reiterate the arguments and evidence that they offered at summary judgment. Those arguments gained no purchase at summary judgment because there was a genuine dispute of material fact about those conversations. That hasn't changed. Just as a jury could find that the emails and phone call between VanderMeer and Molanair were fine, the jury could also find—should they not credit those two doctors' testimony—that VanderMeer in fact tortiously interfered with Ramalingam's contract with ill will. And if that were the case, Ramalingam would be eligible for punitive damages.

In sum, neither of the Hospital Defendants' theories show that I should now intercede to dismiss Ramalingam's claim for punitive damages. As a result, this motion is limine is denied.

## IV.   CONCLUSION

As I have explained, each of the Hospital Defendants' motions *in limine* are denied.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge